The Creditors' National Clearing House, Inc. vs. The Thornley Supply Co.
} No. 91799.

March 16, 1934.

CHURCHILL, J. This is an action of assumpsit brought by the plaintiff, a corporation organized under the laws of the State of Rhode Island, to recover under a written agreement entered into with the defendant corporation.

The plaintiff conducts a mercantile agency and the defendant was a subscriber for its services. The defendant withdrew its claims which were placed in the hands of the plaintiff for collection and thereupon the plaintiff brought suit under the terms of an instrument which, it claims, entitles it to be paid its stipulated commissions as though the amounts had actually been collected by it on the claims so withdrawn.

The defendant resists payment on the general ground that the agreement between the plaintiff and the defendant is illegal, and is illegal in that it contemplates legal services to be performed by the plaintiff.

The Creditors' National Clearing House, Inc., was incorporated in Rhode Island on the 24th day of November, 1909. It is a private corporation organized for profit.

Two of the clauses of the articles of incorporation are of interest. One clause, among other things, purports to give power to the corporation to "conduct and operate an agency or agencies for the collection of debts, obligations and claims of every nature, and to enforce payment thereof by any kind of legal process * * *". Another clause assumed to give power "to * * * maintain, conduct and operate an office or offices for the general practice of the law in all its branches; to advise, assist and render all legitimate services in all sorts of legal business, private or public matters; to contract for, purchase, pay for and furnish the advice, assistance and services of lawyers * * * and of all other public or semi-public officers in all matters wherein the advice, assistance and services of lawyers * * * may be the legitimate and proper subject of contract * * * and to do, so far as is lawful, or cause to be done any and all things usually or ordinarily done by individual lawyers."

Some time later the plaintiff moved its main office to Boston, where it now conducts its business. Warren I. Robinson, who is not a lawyer, is the president and the manager of, and in control of the corporation and directs its policies. It has a large number of employees, a manager and assistant manager who are not lawyers, and also has in its employ two members of the bar of Massachusetts, who are paid by it, either in the form of salaries or commissions for work done, and who carry on their activities in the office of the corporation. All fees and commissions paid by subscribers · in case suit is brought, or otherwise, are remitted to the corporation, and the corporation likewise provides the services of counsel in localities outside of the Boston district to prosecute claims on behalf of the subscribers. Both the counsel who are employed at the home office of the corporation and its counsel appointed in other localities report to the corporation and are under its control. The plaintiff also maintains a corps of solicitors who are authorized to obtain business for the corporation.

In August, 1932, the plaintiff through its agent, one Arden, solicited the defendant to become a subscriber for its services and at the time it was so solicited the sales agent of the plaintiff represented to Albert L. Thornley, the treasurer of the defendant corporation, that the subscriber would be entitled to legal services and advice from the plaintiff corporation.

The instrument now in suit was signed by the proper officer of the defendant corporation on August 2, 1932, and was accepted and signed in Boston by the plaintiff either on that day or on August 3, 1932. It provides for "specialized service for the clearing of accounts receivable" and then follows a series of classifications, in which claims of the subscriber are placed according to their age and character, and it then provides for the transfer from one classification to another in accordance with the response on the part of the debtor. Each division has a particular commission chargeable for collection while the claim is in that particular division.

The fourth division is known as the "General Counsel Division"; the fifth is the "Drastic Attorney Division", and the sixth is the "Special Division" (Paragraph 7). This special division includes, among other things:

"Claims in the form of judgments. protested or unpaid checks or notes; any claim where debtors have made an assignment, or have gone into bankruptcy or are execution proof; any claim against debtors not in business for themselves; or any unusually difficult or long drawn out matters requiring an excessive amount of work. In all such cases the commission shall be commensurate with services rendered, minimum 15%, but shall not exceed one-half of the amount collected".

Paragraph 8 provides that no suit shall be brought without the subscriber's written authority, and where suit is authorized an advance for disbursements shall be made by the subscriber before action; such advance to be accounted for by the plaintiff corporation when suit is disposed of.

"On all claims where suit is brought, a suit fee commensurate with services rendered, minimum $7.50, shall be payable but the total charge of the suit fee and commission shall not exceed one-half of the amount collected. Where bar association rules exist, they shall prevail."

Paragraph 9 provides that any "claim may be withdrawn at any time by the subscriber upon payment of the charges of that particular division in which the claim is then receiving attention, and is to be treated as if the debt had been collected in full."

By paragraph 11, a service fee of $120 is required in addition to the stipulated commission and suit fee and compensation is provided for and in all cases the plaintiff company agrees "to give such claims prompt and expert attention."

On August 3, 1932, the defendant sent to the plaintiff in Boston a schedule of claims under the agreement on a form prepared by the plaintiff and furnished the defendant. On this form so prepared is found an explanation of the services under the agreement and instructions to the subscribers. This may properly be examined as a contemporary construction by the plaintiff itself of its own contract. Such explanatory matters include the following:

"General Counsel Division." "A high grade vigorous demand by our general corporation counsel, which produces prompt and substantial results, in a courteous manner at a cost substantially less than the standard attorneys' rates prevailing throughout the country."

"Drastic Attorney Division." "A hard hitting attorney service which produces substantial results without litigation. However, in those cases wherein your debtor's attitude makes legal action necessary and investigation discloses that such action is advisable and is authorized by you, the most effective action possible is immediately commenced and everything is done to speedily enforce collection regardless of where any debts may be located."

"Immediate Suit." "Conditions frequently arise where drastic action must be commenced immediately to protect your interests and in such cases the flexibility of our service permits the elimination of the proceedings in the above division and enables us to carry out your exact instructions for immediate legal action."

Some work was done on claims both where the debtors resided in Rhode Island and where they resided elsewhere, when, owing to dissatisfaction on the part of the defendant, it withdrew all claims from the plaintiff on September 9, 1932. No further work on such claims was done by the plaintiff. At that time the account between the two corporations was in balance. Thereafter the plaintiff brought this proceeding to recover the amount of $2,886.34 under paragraph 9 of the agreement, claiming the benefit of that paragraph and charging as appears in the bill of particulars, the rates provided for in paragraph 9. A portion of the amount claimed to be due is a balance of the service charge of $120.

The defendant takes the position that the agreement cannot be enforced in the Courts of Rhode Island on the ground that it is ultra vires and that it is illegal for the reason that it is an agreement calling for services on the part of the plaintiff corporation involving the practice of the law and contrary to the provisions of (6238) Sec. 46, Chap. 401, Gen. Laws of 1923, forbidding corporations to practice law or to hold themselves out as entitled to practice law or render legal services.

To clear the way to a determination of the questions involved, it may be pointed out that the agreement is indivisible and, therefore, if any part is infected with illegality, the whole agreement must fail. This much was conceded by counsel for the plaintiff on the argument.

The law is a learned profession and not a trade or business. Entrance to membership in the bar is a high privilege granted by the judiciary in whom is vested authority and power to admit to and control and regulate membership in the profession. Not only so, but on admission to the bar, a lawyer becomes a member of the judicial system, an officer of the Court

whose function it is to aid in advancing the ends of justice. Furthermore, a lawyer is entrusted with duties highly personal, confidential and intimate, and the public has a high interest in the proper qualifications of members of the bar in order that enlightened assistance be afforded in matters of law and advocacy.

Consistent with these principles and with unbroken precedent and the traditions of the common law, and in accordance with the demands of social order, corporations organized for private gain have never been permitted to engage in the practice of the law. The reasons on which the prohibition is founded have been set forth in so illuminating a manner in a classical opinion on that subject that direct quotation is called for.

Judge Vann, writing the unanimous opinion of the Court in

The Matter of Co-operative Law Company, 198 N. Y. 479 (1910), where the right of a corporation to practice law through a staff of attorneys employed on a salary was directly involved, said:

"The relation of attorney and client is that of master and servant in a limited and dignified sense and it involves the highest trust and confidence. It cannot be delegated without consent and it cannot exist between an attorney employed by a corporation to practice law for it and a client of the corporation, for he would be subject to the directions of the corporation and not to the directions of the client; and there would be neither contract nor privity between him and the client and he would not owe even the duty of counsel to the actual litigant. The corporation would control the litigation. The money earned would belong to the corporation and the attorney would be responsible to the corporation only. His master would not be the client but the corporation conducting it, may be wholly by laymen, organized simply to make money and not to aid in the administration of justice, which is the highest function of an attorney and counsellor-at-law. The corporation might not have a lawyer among its stockholders, directors or officers. Its members might be without character, learning or standing. There would be no remedy by attachment or disbarment to protect the public from imposition or fraud, no stimulus to good conduct from the traditions of an ancient and honorable profession, and no guide except the sordid purpose to earn money for stockholders. The bar, which is an institution of the highest usefulness and standing would be degraded if even its humblest members became subject to the orders of a money making corporation engaged not in conducting litigation for itself but in the business of conducting litigation for others. The degradation of the bar is an injury to the State.

"A corporation can neither practice law nor hire lawyers to carry on the business of practicing law for it any more than it can practice medicine or dentistry by hiring doctors or dentists to act for it."

For other authorities dealing with the general question in its various aspects see:

Ex rel *Karlin* vs. *Calkin*, 248 N. Y. 465;

*Creditors' Nat'l Clearing House, Inc.* vs. *Bannivert*, 227 Mass. 579 (a case in which it was held that the plaintiff corporation was practicing law in Massachusetts in violation of the statute);

In re Cannon, 206 Wis. 374;

In re Opinion of Justices (Mass.) 180 N. E. 725;

*Unger* vs. *The Landlords' Management Corp.* 168 Atl. 229 (N. J. Eq. 1933);

*People* vs. *The Merchants' Protective Corp.* 189 Cal. 531 (holding that a corporation employing attorneys to dispense legal services to its members is illegally engaged in the practice of the law.)

*People* vs. *Alfarni*, 227 N. Y. 339; defining practice of law;

*L. Meisel & Co.* vs. *The Nat'l Jewelers Board of Trade*, 152 N. Y. Supp. 913 (App. Div.) holding the practice of the law by corporations is both malum in se and malum prohibitum, and construing the statute similar to the R. I. statute involved.

Not only is the practice of law by a corporation illegal and contrary to public policy at common law, but by statute the State has denounced such actions as criminal by a statute passed in 1917 (6238) Sec. 46, Chap. 401, Gen. Laws 1923.

The statute is much too long to quote in extenso but it denounces as criminal, among other things:

"To practice or appear as an attorney-at-law for any person other than itself in any Court in this state or before any judicial body, or to make it a business to practice as an attorney-at-law, for any person other than itself, in any of said Courts or to hold itself out to the public as being entitled to practice law, or to render or furnish legal services or advice, or to furnish attorneys or counsel or to render legal services of any kind in actions or proceedings of any nature or in any other way or manner, or in any other manner to assume to be entitled to practice law, or to assume, use or advertise the title of lawyer or attorney, attorney-at-law, or equivalent terms in any language in such manner as to convey the impression that it is entitled to practice law, or to furnish legal advice, services or counsel, or to advertise that either alone or together with or by or through any person, whether a duly and regularly admitted attorney-at-law. or not, it has, owns, conducts or maintains a law office or an office for the practice of law, or for furnishing legal advice, services or counsel. It shall be unlawful further for any corporation to solicit itself or by or through its officers, agents or employees any claim or demand for the purpose of bringing an action thereon * * *."

The purported grant of powers in the articles of association authorizing the plaintiff to maintain an office for the general practice of the law and to give legal advice does not help the plaintiff. The plaintiff indeed admitted that such sections of the charter were ultra vires.

The decision in the Matter of Co-operative Law Co., 198 N. Y. 473, is decisive of the point if authority is needed.

The clauses of the articles of associations purporting to confer power to practice law upon this corporation were void and had no legal effect.

Both under the common law and under the statute, the contract must be declared illegal and performance under the contract, both as promised and in fact carried out, to be a violation of the common law and of the statute.

It is not necessary to attempt a nice definition of what constitutes practice of the law as in the following particulars the plaintiff corporation clearly either undertook to or did practice law or otherwise act or promise to act in violation of the statute:

(A) It promised (Par. 7) to collect claims in the form of judgments, claims where debtors have made an assignment or gone into bankruptcy, or where the debtor is execution proof, and claims where the debtors are not doing business for themselves. All of these matters involved questions re-

quiring the exercise of legal knowledge and choice of action based on legal knowledge.

This is not all—in the same agreement, on its face, the subscriber is advised that it has general counsel (par. 4) and that it has an attorney (par. 5). In paragraph 11 it further agrees to give all claims submitted by subscribers prompt and expert attention. What other than legal knowledge, advice or assistance could the company render when it promises to give or gives expert attention to such matters as collecting unpaid judgments, claims where assignments are involved, claims in bankruptcy or where the debtor is doing business in the name of another?

Further illumination is thrown on the character of the document in suit by the practice of the corporation under it. Among the claims sent in for collection by the defendant were five bankruptcy claims and one claim against a firm in receivership in Massachusetts. In regard to this last claim, the assistant manager of the corporation—not a lawyer—wrote the defendant for a notice of receivership, in order "that we may determine the proper steps to take to protect your interests." A number of the claims against debtors in bankruptcy were claims where proceedings were pending in the United States District Court for the District of Rhode Island, and on these claims the plaintiff corporation, acting through the arm of one of its employees, made out the usual creditor's claim called for in bankruptcy procedure and sent such claim on to the defendant subscriber for execution. One of the letters of transmittal contained the following:

"We enclose bankruptcy form for your signature, which should be sworn to in the presence of a notary public under seal; then attach the following items: invoice and statement in each case, and return to us as soon as possible.

"Also send us bankruptcy notice if you have received the same in your files.

"Our attorney will file your claims and protect your interests."

This communication was signed by the assistant manager of the plaintiff corporation, who is not a lawyer. Further comment is unnecessary.

The Court finds and rules that the agreement contemplated, and under it the plaintiff corporation undertook and agreed to render and furnish legal services and advice; and the Court further finds that it actually did so render and furnish legal services and advice to the defendant.

(B) The defendant was secured as a subscriber, at Pawtucket in the State of Rhode Island, by an employee of the plaintiff. At the time he was in treaty with the defendant, he stated that the plaintiff maintained a law department at its office in Boston which furnished advice for the benefit of the subscribers to its service This evidence is uncontradicted. In another and similar aspect the agreement falls under the ban of the statute. When the instrument in suit was presented to Albert J. Thornley, treasurer of the defendant, at Pawtucket, the corporation held itself out on its face as entitled to furnish legal services and advice, and it conveyed the impression that it was entitled to furnish legal advice and services. This was in violation of the statute. If the very document on which suit is now brought in and of itself, when handed to a prospective customer, held the corporation out as entitled to or as able to furnish legal services and advice, and such holding out was in violation of the statute, as in fact it was, it cannot be said with any reason that suit can be maintained in the courts of Rhode Island under such instrument.

(C) The plaintiff agreed to furnish the services of counsel and attorneys,

either in its employ or appointed by it, for the defendant subscriber.

This is manifest on the face of the agreement where it is stipulated that claims should have the services of General Counsel; the expert attention of a Drastic Attorney Division, and that claims involving assignments, judgments and claims in bankruptcy should have expert attention.

As has been pointed out the plaintiff employed two members of the bar at its office who were paid for their services exclusively by it and the record shows that in accordance with the agreement, the plaintiff either furnished counsel in Rhode Island or its attorneys at Boston rendered legal services in Rhode Island.

Under the date of September 10, 1932, the defendant was notified by the plaintiff, in a letter signed by its assistant manager, not a lawyer, that "our attorneys inform us that they have received the following offer from the debtor's attorney in settlement of the above entitled claim" and requested instructions. The debtor resided in Rhode Island and the defendant did not authorize the appointment of the attorney in Rhode Island who was acting for and was to be paid by the plaintiff.

September 16, 1932, the following telegram to a debtor in Rhode Island issued from the Drastic Attorney Division maintained by the plaintiff:

"Unless you telegraph us today Seventeen Hundred and Ninety Eight * * * Dollars due the Thornley Supply Co., Pawtucket, R. I., we will wire our local attorney to commence drastic legal proceedings and enforce collection.".

This telegram was signed "Edwards & Dennett, attorneys for the plaintiff."

The record shows that Edwards & Dennett were lawyers employed and paid by The Creditors' National Clearing House, Inc., for all legal services they rendered in respect to the claims of subscribers and that the Thornley Supply Company never appointed them, or either of them, as its attorneys.

Indeed, it was the manner in which the plaintiff made demands by its lawyers on the debtors of the defendant that led to a withdrawal of the claims by the defendant.

It may also be parenthetically observed here that the situation that arose under the agreement, where the corporation undertook to and did furnish counsel responsible to it in fact and not to the person whom he ostensibly represented, illustrates in full measure the social expediency of the common law rule and the statute which alike forbid a corporation to furnish counsel or attorneys-at-law.

It is unnecessary to encumber this rescript with further instances in respect to furnishing counsel. I find that the agreement provided that the plaintiff should furnish counsel and attorneys-at-law for the defendant and that in point of fact, under the agreement, it did so act.

Plaintiff relies on

*McCarthy* vs. *Hughes*, 36 R. I. 66, as establishing the point that, acting as a collection agency, it could legally furnish counsel to subscribers in this State.

The case does not establish the proposition for which it is urged. The case simply decided that a collection agency in the employment of a constable to make service of writs in suits or claims entrusted to it for collection was an independent contractor and therefore was liable to the constable. The matter of the legality of an agreement to furnish counsel was not passed on, and, moreover, the case was decided in 1913 and Sec. 46, Chap. 401, making it a crime to furnish counsel, was not passed until 1917.

The plaintiff argues that the agreement being executed by the plaintiff in Boston was, hence, a Massachusetts

contract, that performance took place in Massachusetts and that under the provisions of Chap. 221, Secs. 46-47, Gen. Laws, Mass., it was a valid contract and performance was likewise protected by this statute.

Sec. 46, Chapter 221, Gen. Laws, Mass., prohibits a corporation from practicing law or from holding itself out as entitled to practice law, etc.

Sec. 47 of the same chapter contains several saving clauses and exceptions. The one relied on by the plaintiff provides that nothing in the chapter shall prevent a corporation conducting a collection agency from "employing an attorney to give legal advice concerning, or to prosecute actions in Court relating to, the adjustment or collection of debts and accounts only."

It is at least doubtful whether on the evidence the plaintiff is sheltered, in the length and breadth of its agreement and the scope of its operations, by this section, but be that as it may, it is manifest that the plaintiff cannot avail himself of that defence in the Courts of Rhode Island.

On the oral evidence and on the tenor of the instrument in suit, performance in Rhode Island was contemplated. The greater part of the claims were against debtors in Rhode Island; the agreement itself carries no limitation as to what claims shall be handled by the plaintiff, and its president testified that claims were taken and enforced regardless of the residence of the debtors and that by its own attorneys.

One instance out of many where the plaintiff, through its own attorney or other employee took legal action in respect to claims against Rhode Island debtors may be mentioned: the matter of the claims in bankruptcy.

(See particularly *Meisel* vs. *National Jewelers' Board of Trade*, 152 N. Y. S. 913.)

The handling of these claims shows the actual character of the promised services under the agreement and that the agreement contemplated performance in Rhode Island. The point need not be elaborated further since it is on the evidence, and from instances previously adverted to, evident that such was the intent of the document.

I find that the agreement contemplated performance of legal services in Rhode Island and that plaintiff undertook to furnish counsel and attorneys-at-law to act in Rhode Island in respect to the claims of the subscriber. Such undertakings being in violation of the law of Rhode Island, no action can be maintained in this Court to enforce the agreement.

For a case that fully supports this doctrine and goes even beyond it, see

> *Chambers Brothers* vs. *Church & Company*, 14 R. I. 398,

where it was held that a contract valid here but to be performed in the State of Virginia, where it was illegal, could not be enforced in the Courts of this State.

The next position taken by the plaintiff is that it has a license issued under the provisions of Chap. 1782, P. L. 1931, providing, among other things, for the regulation and licensing of collection agencies. The argument is that Sec. 46 of Ch. 401 has a saving clause reading: "This section shall not apply to any corporation lawfully engaged in a business authorized by the provisions of any existing statute", and that, therefore, the plaintiff is protected and its otherwise illegal acts and contracts are validated.

The statutes (Ch. 401, Sec. 46, and Ch. 1782, P. L. 1931) do not have such effect.

Sec. 46, Ch. 401 was passed in 1917 and Ch. 1782 did not become a law until 1931.

Sec. 46, Ch. 401, saves the rights of a corporation then existing and carrying on a lawful business. It was clearly designed to prevent the statute from having a retroactive effect and from penalizing a then lawful business.

But on a broader ground the argument of the plaintiff is untenable. Ch. 1782, P. L. 1931, cannot with reason be construed to allow a licensee to practice law or to do the things prohibited by Sec. 46, Ch. 401, Gen. Laws 1923. As was well stated by counsel for the defendant, the statute is not a grant of power to collecting agencies to do acts forbidden by law but a mere regulative act and passed for entirely different purposes. It was designed solely, as far as collecting agencies are involved, to prevent such concerns from, carrying on the practices condemned in Sec. 9 of the Act.

The plaintiff takes nothing by this point.

Counsel for the plaintiff conceded that if no action can be maintained on the agreement, neither can it recover on the common counts.

From the foregoing consideration it follows that decision must be for the defendant on the grounds that the agreement sued on was illegal under the common law of this State and was in violation of the statute law of the State.

Decision for the defendant.

For plaintiff: Charles. Z. Alexander.

For defendant: Woolley & Blais.